| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CRIMINAL ACTION NO. 1:08-CR-36 |
| | § | |
| JOSEPH EBRON | § | |

**MEMORANDUM AND ORDER**

Pending before the court is Defendant Joseph Ebron's ("Ebron") Motion for New Trial

Based on His Sixth Amendment Right to an Impartial Jury and on Newly Discovered Evidence

(#264). Ebron seeks a new trial pursuant to Federal Rule of Criminal Procedure 33 based on the

court's dismissal of a juror during the guilt/innocence phase of the trial and allegedly newly

discovered evidence in the form of affidavits by a dismissed juror and Michael Bacote ("Bacote"),

a convicted co-defendant. The government opposes such relief, arguing that Ebron's motion is

untimely to the extent that his arguments are based on any reason other than newly discovered

evidence. The government further contends that neither Johnson's nor Bacote's affidavit qualifies

as newly discovered evidence. Having reviewed the motion, the submissions of the parties, the

trial transcript, and the applicable law, the court is of the opinion that a new trial is not warranted.

I.      Background

On May 6, 2007, inmate Keith Barnes ("Barnes") arrived at the United States Penitentiary

in Beaumont, Texas ("USP–Beaumont"), as a transfer from a similar facility in Coleman, Florida.

On May 7, 2007, while in the custody of the Bureau of Prisons ("BOP") at USP–Beaumont,

inmates Ebron, Bacote, Marwin Mosley ("Mosley"), and Charles Cresceno Sherman ("Sherman")

implemented a plan to kill Barnes, in which Sherman and Bacote served as "lookouts" while

Mosley and Ebron entered Barnes's cell, where Barnes was stabbed to death. On August 15,

2007, a grand jury returned a two-count indictment, charging Ebron, Bacote, and Sherman with the unlawful killing of Barnes with malice aforethought, in violation of 18 U.S.C. §§ 1111 and 2, and conspiring to kill Barnes, in violation of 18 U.S.C. §§ 1117, 1111, and 2.[1] The Indictment alleges that on or between May 5, 2005, and May 7, 2005, the defendants developed a plan to commit the murder of the victim, decided on the respective roles each would play, and agreed that certain members of the conspiracy would act as "lookouts" to ensure the murder was successful. On September 11, 2007, the government filed its Notice of Intent to Seek the Death Penalty against Ebron and Bacote. Thereafter, the court granted the defendants' motion to sever and set Ebron for trial on March 23, 2009.

The court conducted general *voir dire* with approximately two hundred panel members participating on March 23, 2009. After listening to the court and counsel's preliminary comments regarding the case and the jury selection process, each panel member completed a jury questionnaire. Counsel reviewed the questionnaires of those individuals who indicated a hardship, disability, time conflict, or other matter appropriate for private discussion with the court. After reviewing the questionnaires, panel members were either discharged from service or released until recalled for individual *voir dire*.

On March 26, 2009, the court commenced individual *voir dire*, with approximately fifteen panel members called per day for individual questioning. Upon the completion of questioning by the government and defense counsel, the panelist was either excused from service or added to the list of potential jurors. Individual *voir dire* ended on April 3, 2009, and counsel submitted their

---

[1] At Ebron's trial, the government explained, "Marwin Mosley died before the case was even indicted." *See* Transcript of Jury Trial, Selection Phase, Vol. 4 at p. 786. Accordingly, the grand jury indicted only Bacote, Ebron, and Sherman.

peremptory strikes to the court. On April 20, 2009, the jury was empaneled and the guilt/innocence phase of the trial began. At the conclusion of the guilt/innocence phase, the court charged the jury and deliberations began. After four days of deliberating, the court dismissed Juror No. 12, Brittany Johnson ("Johnson"). The first alternate replaced Johnson, and the court instructed the jury to being its deliberations anew.

A unanimous jury found Ebron guilty of Counts 1 and 2 of the Indictment on May 11, 2009. Thereafter, on May 13, 2009, the jury determined Ebron was eligible for the death penalty. On May 18, 2009, the jury returned a unanimous verdict, recommending a sentence of death as to Count 1 of the Indictment. Immediately after receiving the jury's verdict, the court sentenced Ebron to death as to Count 1 of the Indictment, while indicating that the sentence as to Count 2 would be imposed at a later date. The court sentenced Ebron to a term of life imprisonment as to Count 2 of the Indictment on June 26, 2009.

Ebron's trial counsel filed a Notice of Appeal on May 19, 2009. Subsequently, on May 20, 2009, counsel filed a Motion for Extension of Time to File Motion for New Trial. On October 21, 2009, Ebron filed the instant motion requesting that the court hold an evidentiary hearing and order a new trial based on three grounds. First, Ebron alleges that the court violated his Sixth Amendment right to a unanimous jury and his Fifth Amendment right to due process when it erroneously dismissed Johnson. Furthermore, Ebron maintains that he has newly discovered evidence in the form of an affidavit from Johnson to support his assertion that she was inappropriately discharged. Lastly, Ebron contends that a newly discovered affidavit from Bacote contains exculpatory statements and is contradictory to Sherman's testimony, the government's primary witness against Ebron.

In its response, filed December 7, 2009, the government avers that Ebron's first argument regarding Johnson's dismissal is not properly before the court because a motion for new trial based on any reason other than newly discovered evidence must be filed within seven days after the verdict or finding of guilty.[2] The government further contends that Johnson's and Bacote's affidavits do not constitute newly discovered evidence.

II.  Analysis

A.     Motion for New Trial

Rule 33 of the Federal Rules of Criminal Procedure permits the court to vacate a judgment and grant a new trial on a defendant's motion if it determines that "the interest of justice so requires." FED. R. CRIM. P. 33(a); *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004), *cert. denied*, 544 U.S. 978 (2005) (citing *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988)); *United States v. Villarreal*, 324 F.3d 319, 324 (5th Cir. 2003).  In considering a motion for new trial, the district court may weigh the evidence and assess the credibility of the witnesses. *See United States v. Fuchs*, 467 F.3d 889, 910 (5th Cir. 2006); *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997).  The court, however, "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Robertson*, 110 F.3d at 1118.  "A motion for new trial 'is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial . . . should be invoked only in exceptional cases . . . .'" *United States v. Sipe*, 388 F.3d 471, 493 (5th Cir. 2004) (quoting

---

[2] The court notes that, effective December 1, 2009, a motion for new trial on grounds other than newly discovered evidence must be filed within 14 days of the verdict or finding of guilty. *See* FED. R. CRIM. P. 33(b)(2).  For the purpose of this Memorandum and Order, however, the prior seven-day rule applies.

*Robertson*, 110 F.3d at 1120 n.11); *see United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005). "[U]nless the weight of the evidence is heavily against the verdict, it is not a miscarriage of justice to let the verdict stand." *United States v. Valentine*, 401 F.3d 609, 614 (5th Cir.), *cert. denied*, 545 U.S. 1116 (2005) (citing *Robertson*, 110 F.3d at 1118). A finding by the court, however, that a miscarriage of justice occurred at trial qualifies as an exceptional case that warrants the granting of a new trial in the interest of justice. *See Robertson*, 110 F.3d at 1120.

"Rule 33 divides motions for new trial based on the interest of justice into two different subcategories: (1) motions based on newly discovered evidence; and (2) motions based on 'other grounds.'" *Wall*, 389 F.3d at 466. "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty, or within such further time as the court sets during the 7-day period." FED. R. CRIM. P. 33(b)(2) (effective December 1, 2009, the rule provides a 14-day period); *see United States v. Lopez*, 979 F.2d 1024, 1036 (5th Cir. 1992), *cert. denied*, 508 U.S. 913 (1993). This deadline is generally viewed as an inflexible claim-processing rule that prevents the court from accepting a late-filed motion if the government objects. *See Eberhart v. United States*, 546 U.S. 12, 19 (2005). Rule 33 further specifies that:

> Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

FED. R. CRIM. P. 33(b)(1). "Whether a motion for new trial based on newly discovered evidence is filed within seven days, or some time later, but still within three years, the standard of review is the same." *Wall*, 389 F.3d at 468 (citing *United States v. Quintanilla*, 193 F.3d 1139, 1146-47 (10th Cir. 1999), *cert. denied*, 529 U.S. 1029 (2000); *United States v. Johnson*, 26 F.3d 669, 682

n.9 (7th Cir.), *cert. denied*, 513 U.S. 940 (1994)). "The obvious reason for the differentiation in the filing deadlines is that a defendant may not learn of newly discovered evidence until well after the trial, but should know all other grounds at the time of trial." *Id.*

B.    Timeliness of Ebron's Motion for New Trial

As to Ebron's argument that a new trial is warranted because the court violated his Sixth Amendment right to an impartial jury when it discharged Johnson, the government maintains that this claim is not properly before the court because Ebron's motion was not filed within seven days after the verdict or finding of guilty, nor is it based on newly discovered evidence.

As stated above, a motion for new trial grounded on any reason other than newly discovered evidence should be filed within seven days after the verdict or finding of guilty. Fed. R. Crim. P. 33(b)(2). "When an act must be or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made before the originally prescribed or previously extended time expires; or after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1). "[T]he court itself is not required to act on that motion within any particular time." Fed. R. Crim. P. 33 & 45 advisory comm. notes.

In the instant case, the jury returned its verdict and finding of guilt on May 11, 2009. Pursuant Rule 33, Ebron should have filed his motion grounded on reasons other than newly discovered evidence within seven days after the verdict or finding of guilty—on or before May 20, 2009. *See United States v. Frye*, No. 4:01-CR-8-WHB, 2008 WL 2945414, at *2-3 (S.D. Miss. July 25, 2008) (finding that the continuation of the defendant's criminal trial on the issue of whether the death penalty should be imposed did not extend the period for filing a Rule 33 motion)

(citing *United States v. Hill*, 177 F.3d 1251, 1253 (11th Cir. 1999) (concluding that decisions relating to sentencing do not affect the running of the time periods set forth in Rule 33)); *see also* Fᴇᴅ. R. Cʀɪᴍ. P. 45(a)(2) (applicable provision excluded intermediate Saturdays, Sundays, and legal holidays when the period is less than 11 days). Instead, on that day, Ebron filed a motion for an extension of time to file a motion for new trial. Ebron stated that he desired "to have full advantage of the options available to him to file an appeal and a motion for new trial with experienced appellate counsel." On July 21, 2009, the court replaced one of Ebron's trial attorneys with an appellate attorney. Jimmy Phillips ("Phillips"), one of the trial attorneys, however, continued to represent Ebron.

The court denied Ebron's motion for an extension of time on December 11, 2009, to the extent it remained viable. Thereafter, on December 16, 2009, Ebron filed a motion for reconsideration, arguing that he demonstrated "good cause" for the extension, being that: "(1) this was a capital case; (2) new appellate counsel would be appointed to review the lengthy documents and record; (3) additional time was necessary so that trial counsels' motion to withdraw could be considered and new appellate counsel found and appointed, and (4) the lengthy record could be transcribed, read, and acted upon." In this instance, Ebron has failed to demonstrate the requisite good cause.

Ebron's first contention that the court violated his Sixth Amendment right to a fair and impartial jury does not allege any newly discovered evidence; rather, it discusses matters arising during trial. The motion for new trial, however, was not filed until October 21, 2009. The court finds no persuasive reason for the five-month delay. Moreover, the issues surrounding Johnson's dismissal were raised and discussed at length by the court and counsel while the trial was pending.

Immediately following Johnson's dismissal, Ebron filed a motion for mistrial, outlining the same arguments that he reiterates in this motion. The court addressed and rejected these arguments in its Memorandum and Order dated May 18, 2009. Accordingly, Ebron's motion for reconsideration is DENIED.

C.    Dismissal of Juror No. 12

Assuming *arguendo* that Ebron's motion regarding Johnson's dismissal was filed in a timely manner, the court finds it fails on the merits. The events leading up to Johnson's dismissal are summarized below.

On Thursday afternoon, April 30, 2009, the jury began deliberating in the guilt/innocence phase of this case, which required the jury to consider whether the government proved the charges against Ebron beyond a reasonable doubt. The following day at 3:20 p.m., the court received Note No. 11 from the foreperson stating that "[t]he jury is hopelessly deadlocked and cannot reach a unanimous verdict." The court instructed the jury to continue its deliberations. Deliberations concluded at approximately 5:00 p.m. and resumed on Thursday, May 7, 2009, at 9:00 a.m. At 9:45 a.m., the court received Note No. 13 from the foreperson that read:

> There is no way we can arrive at a unanimous decision. I don't believe any amount of further deliberation will achieve any movement. There has been no change since Friday morning.
>
> I can discuss this with you privately if you wish.

At that time, the Court read the Fifth Circuit's Pattern Jury Instruction No. 1.45, Modified "Allen" Charge, to the jury, and the jury resumed deliberations.

On Friday, May 8, 2009, at approximately 1:15 p.m., upon her return from the lunch recess, Johnson, Juror No. 12, sent Note No. 18 to the court, which stated:

Judge,

If at all possible, I would like to speak with you about a personal matter before we resume deliberations.

Thank You,
Juror #12

In response, the court requested that Johnson provide an indication of the nature of her personal matter. Johnson replied:

I am having "issues" with the deliberations; voices have been raised & I have been cursed at. I am 8 weeks pregnant & do not want the other jurors to know. The jury is hung. We have deliberated thoroughly. This is a terrible situation for me to be a part of. I would like to know my rights as a juror pertaining to deliberations. My pregnancy is no one's business and am not using it in any way. This is extremely stressfull [sic] and would like to know how much more I will have to endure. Thank you very much for your time and consideration.

Juror #12

At that time, defense counsel, Katherine Scardino's ("Scardino") made an oral motion for a mistrial, and the government requested that the court investigate whether Johnson was refusing to deliberate or follow the court's oath. The court denied the motion for a mistrial and directed Johnson to "return to the jury room and follow the court's instructions." The court security officer delivered the message and reported that Johnson read the court's written response and returned to the jury room with no verbal response.

At 3:45 p.m., the court received Note No. 20 from the foreperson, requesting permission for a juror to attend her children's awards program on Tuesday, May 12, 2009. The jury's apparent anticipation of continuing its deliberations into the following week prompted Scardino to lodge an oral motion for mistrial. She explained:

Apparently there is something happening in the jury room. I don't know whether they have—I mean, I just don't know. Maybe the court could write a note back and

inquire as to "Are you close to a verdict? Do you"—I mean, of some kind—I don't know. I mean, that's kind of out of my purview, I understand. But I feel like at this time, after all this deliberation and now we get a note inquiring about next Tuesday, I mean, I think the defense has to request a mistrial at this time or, alternatively, some method of finding out where the jury is.

Although the government opposed the granting of a mistrial at this juncture, it suggested that the court speak with the foreperson regarding the status of the deliberations.

If you bring the foreman in and simply ask him, "Is the jury deliberating or not," if he tells you that they are, then you send him back and let them continue deliberations. But if he tells you that one of the jurors is refusing to deliberate, then you further ask him, "Is it based on her interpretation of the evidence" or "Is it based on something else?"

After hearing arguments from all counsel on the matter, the court proposed posing the following questions, derived from case law, to the foreperson in order to determine the status of deliberations: (1) Are you personally experiencing any problems with how the deliberations are proceeding, without telling us anything about the vote as to guilt or innocence? If yes, describe the problem. (2) Are all the jurors discussing the evidence or lack of evidence? (3) Are all the jurors following the court's instructions on the law? (4) Is there any juror or jurors who are refusing to deliberate? (5) Is there any juror who is refusing to discuss the evidence or lack of evidence? (6) Is there any juror who is refusing to follow the court's instructions? *See United States v. Kemp*, 500 F.3d 257, 273-74 (3d Cir. 2007), *cert. denied*, 128 U.S. 1329 (2008). Both sides agreed with this course of action and that the questions were appropriate.

| THE COURT: | Okay. Do you want me at this point to get the foreperson to show up here to ask these questions? |
| --- | --- |
| MS. SCARDINO: | I think so. I would like that. |
| MR. BATTE: | Yes, your Honor. |

Accordingly, the foreperson was brought into the courtroom and asked the agreed-upon questions. The foreperson stated that, in his opinion, Johnson was refusing to follow the court's instructions. He mentioned that Johnson was using previous life experiences and emotions to influence her deliberations. Specifically, the foreperson claimed that he believed Johnson's prior experiences had biased her against the prosecution and its witnesses. He stated:

> There was mention of a three-year ordeal with the district attorney in which apparently testimony was given which was the absolute truth but they were called—they were ridiculed; called liars; and they got a sour taste for prosecution, prosecution witnesses and feels that when anybody gets on the stand, they could very well be telling the truth and just because there's inconsistencies doesn't mean that you can't believe anything they say.[3]

He also implied that Johnson had done some outside research on Scardino and communicated extrinsic evidence to the jury in violation of the Court's instructions. Elaborating, the foreperson disclosed that Johnson mentioned this would be the fourth time that Scardino has "rescued" someone from death row.[4]

The foreperson's statements regarding Johnson's ostensible violation of her oath and the court's instructions prompted the court to pose the same agreed-upon questions to each member

---

[3] It should be noted that during the *voir dire* process, Johnson disclosed the fact that her husband had previously been prosecuted for a misdemeanor offense in Jefferson County, Texas. Despite her belief that her husband was not treated fairly, she assured the parties that she could be fair and impartial in this case and would not hold that experience against the government. This information was disclosed only to the court and the attorneys during *voir dire*; the other jurors would have known nothing about this unless Johnson mentioned it during deliberations. Moreover, many jurors indicated that Johnson referred to this experience as a "three-year ordeal," a description that was never voiced to the court or the attorneys.

[4] Interestingly, a cursory Internet search revealed an article, which states that in Scardino's previous four capital murder cases, "she'd gotten one dismissal, one life sentence, one hung jury and one outright acquittal." Steve McVicker, *Queen of the Good Ol' Boys*, Houston Press, Mar. 25, 1999, *available at* http://www.houstonpress.com/1999-03-25/news/queen-of-the-good-ol-boys. On the record, Scardino disputed the current accuracy of these figures, indicating that she had served as counsel in sixteen capital murder cases and has one client on death row.

of the jury. *See United States v. Fryar*, 867 F.2d 850, 854 (5th Cir. 1989) (noting "the scope of an investigation into juror misconduct rests with the court's discretion"). The court security officers were directed to bring each juror into the courtroom separately in the order of their juror number, whereupon the court began further investigation. During the court's inquiry, seven jurors reported that Johnson's reliance on her previous experiences were influencing her deliberations. Additionally, three jurors recalled Johnson making comments about Scardino's professional track record.

Johnson, Juror No. 12, was summoned last. While she maintained that she was deliberating in accordance with the court's charge, she hesitantly admitted having voiced opinions concerning past personal experiences during the course of the deliberations.

> I—I just said that when—when we're talking about my—I said my husband—I said some—I said there was a legal issue with him and I said I do know that sometimes people want to get on the stand to tell their side of the story. That's all I said.

She also denied making any personal comments about the participants in this case, including the attorneys. Ultimately, the court found the testimony of the other jurors to be more credible than that given by Johnson. Therefore, the court discharged Johnson for failing to follow the court's

explicit instructions and displaying a lack of candor.[5] The first alternate was directed to report to the jury room the following business day.[6]

In the instant motion, Ebron argues that the court's questions elicited information from the jury that implicated the deliberation process and the resulting testimony revealed that Johnson had assessed the evidence and reached a different conclusion as to which witnesses to believe and whether the government had met its burden. Ebron asserts that, under these circumstances, when the evidence reveals an array of explanations for a disagreement in the jury room, a more stringent standard should be applied—one which prevents dismissal unless there is no possibility that a juror's position is based on his or her view of the evidence. The court finds Ebron's argument to be misplaced.

The Fifth Circuit recognizes that a district court has the discretion to dismiss jurors for just cause. *See United States v. Edwards*, 303 F.3d 606, 631 (5th Cir. 2002), *cert. denied*, 537 U.S. 1192 (2003) (citing *Fryar*, 867 F.2d at 853); *see also* FED. R. CRIM. P. 23(b)(3); *United States v. Nnaji*, 70 F. App'x 217, 218 (5th Cir. 2003). "A district court's decision to remove a juror is discretionary 'whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired.'" *United States v. Virgen-Moreno*, 265 F.3d 276, 288 (5th Cir. 2001),

---

[5] On April 20, 2009, the court administrator administered the following Oath to the jury: "You, and each of you, do solemnly swear that you will and truly try the case about to be submitted to you and a verdict render therein according to law and the evidence as submitted to you by the court so help you God." The Court subsequently instructed the jury that "[a]nything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely from the evidence presented here in the courtroom." Additionally, in the Court's charge to the jury in the guilt/innocence phase of the trial, the Court specifically stated, "It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy."

[6] Following Johnson's dismissal, on May 10, 2009, Ebron filed a Declaration of Mistrial (#154). As noted above, the court denied the motion in its Memorandum and Order (#168) dated May 18, 2009.

*cert. denied*, 534 U.S. 1095 (2002) (quoting *United States v. Leahy*, 82 F.3d 624, 628 (5th Cir. 1996)). "A district court abuses its discretion only 'when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Edwards*, 303 F.3d at 631 (quoting *Whitehead v. Food Max of Miss., Inc.*, 277 F.3d 791, 792 (5th Cir. 2002)); *see United States v. Kemp*, No. 04-370, 2005 WL 1006348, at *6 (E.D. Pa. Apr. 28, 2005).

Despite Ebron's argument to the contrary, Johnson was not removed because of her apparently nonconforming view of the evidence. Rather, as discussed in the Memorandum and Order dated May 18, 2009, the court's decision to dismiss Johnson rested on two independent and relevant grounds—her failure to follow the court's instructions regarding the interjection and use of extrinsic information during jury deliberations and her lack of candor under oath. *See Edwards*, 303 F.3d at 631 (citing *Fryar*, 867 F.2d at 853 (citing *United States v. Dominguez*, 615 F.2d 1093, 1095 (5th Cir. 1980); *United States v. Smith*, 550 F.2d 277, 285 (5th Cir. 1977)); *United States v. Vega*, 72 F.3d 507, 512 (7th Cir. 1995)); *see also United States v. Ginyard*, 444 F.3d 648, 652 (D.C. Cir. 2006).

Failure to follow the court's instructions is a relevant legal basis for discharging a juror. *See Edwards*, 303 F.3d at 631 (citing *Vega*, 72 F.3d at 512 (affirming the district court's decision to remove a juror based on his failure to follow the court's instructions)); *see also United States v. Seal*, 165 F. App'x 975, 978 (3d Cir. 2006) (affirming the district court's decision to dismiss a juror following his failure to follow the court's instructions); *Abbell*, 271 F.3d at 1302 (providing that "just cause exists to dismiss a juror when that juror refuses to apply the law or to follow the court's instructions"). In the instant case, during its preliminary instructions, the court specifically prohibited the jury from conducting any independent research: "Do not try to do any

research or make any investigation about the case on your own. Do not consult any outside sources, such as dictionaries, encyclopedias, or the Internet." Furthermore, the court instructed: "Do not read any news stories or listen to any radio or television reports touching on this case in any way. Therefore, you must not read the Beaumont, Port Arthur, or Orange newspapers, watch or listen to any local television or radio news reports, or access any Internet news sites generated by these media sources."

Despite these instructions, three jurors remembered Johnson making comments about Scardino's professional track record. Specifically, the foreperson noted that Johnson "mentioned something about that this would be the fourth time that Ms. Scardino has rescued somebody from death row." Juror No. 3 explained that Johnson "talked about how Ms. Scardino has gotten three people off of death row." Juror No. 8 recalled Johnson stating that "Ms. Scardino was a top-notch attorney that's gotten people off death row." Thus, the court found that, based on its observations of all the jurors and the evident consistency of the statements, Johnson disregarded the court's instructions by consulting an extraneous source for information on Scardino and then proceeded to divulge what she discovered to other jurors. *See Edwards*, 303 F.3d at 631 (affirming the district court's removal of a juror based on his inability to follow the court's instructions); *Kemp*, 2005 WL 1006348, at *3 (affirming the district court's dismissal of a juror based on, among other reasons, her refusal to follow the court's instructions and her demonstrated bias against the prosecution).

Moreover, a district court has discretion to excuse an untruthful juror. *See United States v. Webster*, 162 F.3d 308, 348 (5th Cir. 1998), *cert. denied*, 528 U.S. 829 (1999) (citing *Fryar*, 867 F.2d at 853; *United States v. Coleman*, 997 F.2d 1101, 1106 (5th Cir. 1993)); *see also*

*Dominguez*, 615 F.2d at 1095. Jurors—like attorneys, witnesses, and parties—must show candor when speaking under oath in the judicial process. *See Fryar*, 867 F.2d at 853-54. Furthermore, the district judge is in the best position to assess the candor and credibility of the jurors. *See United States v. Tejada*, 481 F.3d 44, 53-54 (1st Cir. 2007); *Salazar v. Dretke*, 419 F.3d 384, 393 n.11 (5th Cir. 2005), *cert. denied*, 547 U.S. 1006 (2006).

Here, Johnson denied making any personal comments about the participants in the case, including the attorneys. Furthermore, Johnson also denied expressing any views about the prosecution, despite the testimony of six jurors confirming the foreperson's assessment that Johnson's deliberations were impacted by her reliance on a previous "three year ordeal" with the district attorney that gave her a "sour taste for prosecution." Specifically, Juror No. 2 told the court that Johnson disclosed that "she went through holy hell with prosecutors." Similarly, Juror No. 3 stated, "There's one juror that seems to have a problem with the DA before this trial." Juror No. 6 confirmed that Johnson made comments about a court case that she had to go through. "I think it lasted something like three years. And a comment was made that 'I don't want to see anybody go through what [I] went through.'" Juror No. 8 remarked that Johnson used her personal feelings about "the three year problem" in her deliberations. "It felt like there was a problem they felt towards the prosecution of their own case." Juror No. 9 divulged that Johnson made statements that "her and her husband had some kind of problems for three years and she made the statement that she didn't want to see nobody go through that, problems." Lastly, Juror No. 11 recalled Johnson stating that "a district attorney gave them a hard time for three years and I would hate for something that happened to somebody . . . ." Therefore, based on the testimony of the jurors, the court found Johnson's statements to the court to be lacking in candor. *See*

*Edwards*, 303 F.3d at 631 (affirming the district court's dismissal of a juror because "in his dealings with the court, [the juror] was lacking in candor"); *Abbell*, 271 F.3d at 1303 (noting that the district court is "uniquely situated" to make credibility determinations); *see also Ristaino v. Ross*, 424 U.S. 589, 595 (1976) (recognizing that "the determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge"); *United States v. Gabay*, 923 F.2d 1536, 1542-43 (11th Cir. 1991) (finding that "good cause" existed to remove a juror accused of discussing the defendant's guilt before deliberations began despite the juror's denial of such discussions).

While Ebron relies on the standard for dismissal enunciated in *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987), the Fifth Circuit has explained that the stringent rule announced in *Brown*, *Thomas*, and its progeny applies only to dismissals based on "jury nullification"—a juror's determination to vote without regard to the evidence. *Edwards*, 303 F.3d at 632 (citing *United States v. Symington*, 195 F.3d 1080 (9th Cir. 1999); *United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997), *cert. denied*, 531 U.S. 1069 (2001)). "*Brown*, *Thomas* and *Symington* stand for the limited proposition that a court may not dismiss a juror based upon its conclusion that the juror is failing to participate in the deliberative process in accordance with law unless there is no possibility that the juror's problem stems from his view of the sufficiency of the evidence." *Id.* at 633. "It is based on the difficulty in detecting the difference between a juror's illegal act of nullification, by deciding to vote against the weight of the evidence, and the juror's failure to be convinced of the defendant's guilt." *United States v. Baker*, 262 F.3d 124, 131 (2d Cir. 2001). Thus, the court finds the standard enunciated in *Brown* and its progeny to be inapposite in the instant situation.

Finally, Ebron's suggestion that Johnson's status as a holdout juror somehow insulated her from dismissal for misconduct lacks merit. The Fifth Circuit has "previously made clear that hold-out jurors are not immune from dismissal based upon just cause." *Edwards*, 303 F.3d at 634 (citing *United States v. Huntress*, 956 F.2d 1309, 1312-13 (5th Cir. 1992) (citing *United States v. Wilson*, 894 F.2d 1245, 1250 (11th Cir. 1990))). Johnson was not dismissed based on her view of the evidence, but rather, for failing to follow the court's instructions and displaying a lack of candor. The court found that Johnson violated her oath as a juror, disregarded the court's instructions by interjecting extrinsic factors and information into jury deliberations, and prevaricated when questioned by the court. Accordingly, the court reaffirms its original finding that Johnson's dismissal was appropriate.

D.    Motion for New Trial Based on Newly Discovered Evidence

"Motions for new trial based on newly discovered evidence are disfavored." *United States v. Bowler*, 252 F.3d 741, 747 (5th Cir. 2001) (citing *United States v. Gonzalez*, 163 F.3d 255, 264 (5th Cir. 1998)); *see Wall*, 389 F.3d at 467 (citing *United States* v. *Erwin*, 277 F.3d 727, 731 (5th Cir. 2001)). The Fifth Circuit has traditionally applied what has come to be known as the *Berry* rule to motions for new trial based on newly discovered evidence. *See United States v. Freeman*, 77 F.3d 812, 816-17 (5th Cir. 1996) (citing *United States v. Pena*, 949 F.2d 751, 758 (5th Cir. 1991); *Berry v. Georgia*, 10 Ga. 511 (1851)); *see also Wall*, 389 F.3d at 467 & n.7 (noting that "the Fifth Circuit has described the *Berry* rule as having four or five parts") (citing *Erwin*, 277 F.3d at 731-32 (five-part test); *United States v. Sullivan*, 112 F.3d 180, 183 (5th Cir. 1995), *cert. denied*, 516 U.S. 1083 (1996) (four-part test)). Under the *Berry* rule, a new trial is not justified due to allegedly newly discovered evidence unless the defendant demonstrates:

> (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence introduced at a new trial would probably produce an acquittal.

*United States v. Franklin*, 561 F.3d 398, 405 (5th Cir.), *cert. denied*, 129 S. Ct. 2848 (2009) (quoting *Bowler*, 252 F.3d at 747); *see United States v. Severns*, 559 F.3d 274, 280 n.13 (5th Cir. 2009) (citing *Wall*, 389 F.3d at 467). "If the defendant fails to demonstrate any one of these factors, the motion for new trial should be denied." *Wall*, 389 F.3d at 467 (citing *Freeman*, 77 F.3d at 817); *accord Bowler*, 262 F.3d at 747 (citing *Sullivan*, 112 F.3d at 183).

### 1.    Johnson's Affidavit as Newly Discovered Evidence

In the instant case, the first allegedly newly discovered evidence consists of a thirteen-page affidavit by Johnson, in which she recounts Ebron's trial, her assessment of the evidence, and the jury's deliberations. Ebron contends that "the affidavit provides new, detailed evidence that Johnson's position as a 'holdout' was not the result of bias, as the other jurors assumed, but the result of her view of the evidence." Hence, he maintains that her dismissal was inappropriate. In its response, the government asserts that Johnson's affidavit does not satisfy the newly discovered evidence requirement. The court agrees.

### a.    Evidence Unavailable at Trial and Due Diligence

Admittedly, there are major distinctions in the substance of evidence proffered as to the fairness of the trial as opposed to the usual question of guilt or innocence. *See United States v. Jones*, 597 F.2d 485, 488 (5th Cir. 1979), *cert. denied*, 444 U.S. 1043 (1980). "Regardless of those distinctions a motion for new trial cannot be based on newly discovered evidence unless that evidence is in fact unknown to the movant until after the verdict." *Id.* Furthermore, "[e]vidence

19

that is unknown at the time of trial cannot be the basis for granting a new trial if the defendant should have known of its existence through the exercise of due diligence." *Wall*, 389 F.3d at 469.

Ebron maintains that he could not have obtained an affidavit from Johnson immediately following her dismissal because the court's instructions and the local rules prohibit attorneys from speaking with jurors during trial. Johnson was discharged on May 10, 2009, prior to the verdict, at which time Ebron was aware of the facts necessary to investigate any error in her dismissal. Counsel could have requested permission to speak with Johnson following her dismissal pursuant to Local Rule CR-24(b).[7] It is unlikely, however, that the court would have granted this request considering that trial counsel continued to represent Ebron during the Eligibility and Punishment phases that began following the guilty verdict.

Immediately after Ebron's trial and initial sentencing, the court provided the government and defense counsel with the opportunity to converse with members of the jury. Neither Scardino nor Phillips elected to speak with the jury. Moreover, although the court appointed appellate counsel to replace Scardino on July 21, 2009, Phillips continued to represent Ebron. There is no evidence that Phillips made any seasonable effort to contact Johnson. Rather, Ebron's counsel did not obtain an affidavit from Johnson until October 18, 2009, five months after the verdict was

---

[7] Local Criminal Rule 24(b)(1) provides:

    (b)       Communication with Jurors

         (1)       No party or attorney for a party shall converse with a member of the jury during the trial of an action.

         (2)       After a verdict is rendered but before the jury is discharged from further duty, an attorney must obtain leave of the judge before whom the action was tried to converse with members of the jury.

         (3)       Nothing in this rule shall be construed to limit the power of the judge before whom an action is being or has been tried to permit conversations between jurors and attorneys.

LOCAL RULE CR-24(b).

rendered, without providing an adequate reason for the lack of diligence. Hence, although Ebron satisfies the first factor, he fails to establish the exercise of due diligence.

    b.    Whether Evidence is Cumulative, Impeaching, or Material

Ebron asserts that Johnson's affidavit is neither cumulative nor impeaching because it adds significant and important details as to her understanding and opinion of the evidence and the witnesses, as well as her understanding of her ethical obligations as a juror. Moreover, Ebron alleges that the affidavit provides a different perspective as to the jury's deliberations and does not impeach the other jurors' statements. Specifically, Ebron contends that the affidavit is material because it demonstrates that "Johnson refused to vote 'guilty' because she believed, after considering the evidence, that the Government had not proved Ebron guilty." Thus, Ebron maintains that, under these circumstances, her dismissal was improper.

In contrast, the government contends that Johnson's affidavit merely expands upon her answers to the court or contradicts the information provided by the other jurors. The government points out that a large portion of Johnson's affidavit discusses the jury's deliberative process and her disdain for the other members. As such, it is merely cumulative or impeaching. The court agrees.

In her affidavit, Johnson contests the validity of the information provided to the court by other jurors. Specifically, Johnson states that "at no time did I mention to any of the Jurors what situation I was referencing when I said that my husband and I had experienced something which made me feel people should be allowed to tell their side of the story. I never made comments about the Prosecution side and I was not negative about any of the District Attorneys." During the court's questioning of the foreperson, however, he described how Johnson's prior experiences

had biased her against the prosecution and its witnesses. As mentioned above, he divulged that "[t]here was mention of a three-year ordeal with the district attorney in which apparently testimony was given which was the absolute truth but they were called—they were ridiculed; called liars; and they got a sour taste for prosecution . . . ." Furthermore, several jurors confirmed that Johnson referred to her past experience "with the District Attorney" as a "three-year ordeal" and that she "went through holy hell with prosecutors."

In her affidavit, Johnson also states:

I have never performed any research on Scardino about her law practice or her individually. I never had any discussions pertaining to Scardino with anyone on the Jury. I recalled that there were conversations about Scardino during breaks, but mainly just comments about the fact that Scardino was from Houston when she had introduced herself. I was very aware I could not conduct research on anyone involved in the trial.

As previously noted, three jurors recalled hearing Johnson make comments about Scardino's professional track record. The foreperson stated that Johnson "mentioned something about that this would be the fourth time that Ms. Scardino has rescued somebody from death row." Juror No. 3 stated, "Okay. There's one juror that seems to have a problem with the DA before this trial. She even—or—spoke of problems before with the DA and this person also, before deliberations, started—talked about how Ms. Scardino has gotten three people off of death row." Juror No. 8 recalled Johnson stating that "Ms. Scardino was a top-notch attorney that's gotten people off death row." The court finds Johnson's affidavit to be cumulative, impeaching, and wholly lacking in credibility.

Furthermore, the remaining portions of Johnson's affidavit refer to the method of the jury's deliberative process, arguments voiced during the deliberations, the effect of particular arguments or evidence upon the outcome, the mindset or emotions of many jurors during deliberations, and

22

Johnson's own mental processes during deliberations. This information is immaterial because, as discussed above, Johnson's dismissal was based on her failure to follow the court's instructions and lack of candor, not her status as a holdout juror or her view of the evidence. Hence, there were independent reasons to dismiss Johnson for "good cause" under Rule 23(b). *See Ginyard*, 444 F.3d at 307-08 (noting that "a defendant's Sixth Amendment right is infringed when there is some causal link between a juror's holdout status and the juror's dismissal"). Such a link is absent here. Therefore, Ebron fails to satisfy the third and fourth factors of the *Berry* analysis.

c.     New Trial in the Interest of Justice

The Fifth Circuit has indicated that the defendant must demonstrate that the newly discovered evidence if introduced at a new trial would probably produce an acquittal. *See United States v. Holmes*, 406 F.3d 337, 359 (5th Cir. 2005); *Wall*, 389 F.3d 471; *United States v. Blackthorne*, 378 F.3d 449, 452 (5th Cir. 2004). "[T]his standard is not entirely applicable where the new evidence alleges juror misconduct because a juror's conduct is not relevant evidence of whether a defendant should be acquitted . . . ." *United States v. Taylor*, No. 1:04-CR-160, 2009 WL 311138, at *2 (E.D. Tenn. Feb. 6, 2009) (citing *United States v. Blackwell*, 459 F.3d 739, 769 (6th Cir. 2006)); *see Jones*, 597 F.2d at 488. "'In either case, the movant makes a substantive showing that he is entitled to a new trial.'" *United States v. Parks*, No. 5:05-CR-257-V, 2009 WL 294396, at *5 (W.D.N.C. Feb. 5, 2009) (citing *Holmes v. United States*, 284 F.2d 716, 719 (4th Cir. 1960)). Thus, because Ebron's evidence goes to the fairness of the trial process rather than to the usual question of guilt or innocence, the court will construe the argument "as one for a new trial in the interests of justice based on new evidence." *Taylor*, 2009 WL 311138, at *2 (citing *Blackwell*, 459 F.3d at 769); *see Jones*, 597 F.2d at 488.

Johnson's apparent desire to assist Ebron in his quest for a new trial does not excuse her misconduct during the trial and deliberations. In an affidavit signed five months after trial, Johnson continues to deny making any negative remarks about her experience with the District Attorney's office or commenting on Scardino's professional track record. Her insistence on the propriety of her actions, however, is belied by the testimony of the other jurors. The court cannot overlook the consistency among the remaining jurors who testified individually, outside the presence of each other, whose recollections of Johnson's statements are too similar to have been fabricated. Moreover, the alleged comments about her husband's negative experience in a criminal proceeding are also corroborated by her own statements during *voir dire*. Accordingly, the court finds that a new trial is not warranted in the interest of justice.

### 2.    Bacote's Affidavit as Newly Discovered Evidence

Bacote was charged in the same two-count indictment as Ebron, and on September 11, 2007, the government filed its Notice of Intent to Seek the Death Penalty as to Bacote. Thereafter, the court set Bacote for trial on June 17, 2009. Several days before Ebron's trial, on April 16, 2009, Bacote's counsel filed a Notice to the Court, stating, "I hereby acknowledge that I have advised Michael Bacote to exercise his right to remain silent in the case of *United States of America v. Joseph Ebron* (No. 1:08-CR-36). Mr. Bacote refuses to testify." Hence, during Ebron's trial, Bacote invoked his Fifth Amendment privilege against self-incrimination and refused to testify.

Following a detailed mental health examination by a government expert, tests revealed that Bacote is mentally retarded, and the government withdrew its Notice of Intent to Seek the Death Penalty on June 5, 2009. *See Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the Eighth

24

Amendment's prohibition of "cruel and unusual punishment" bars execution of mentally retarded offenders).  On June 22, 2009, Bacote appeared with counsel and pled guilty to a one-count information charging him with second degree murder and aiding and abetting in the murder of Barnes in violation of 18 U.S.C. §§ 1111 and 2.  After waiving the preparation of a presentence report, the court sentenced Bacote to a term of imprisonment of 336 months in accordance with a plea agreement between him and the government.

In the instant motion, Ebron contends that, after he was sentenced to death, Bacote contacted Ebron's appellate counsel and indicated that he wished to provide a statement exculpating Ebron.  Notably, both Ebron and Bacote are housed at the Administrative Maximum (ADX) facility in Florence, Colorado.  On August 27 and 28, 2009, Ebron's counsel spoke with Bacote and, thereafter, Bacote signed the following affidavit:

> On June 22, 2009, I entered into a plea agreement with the United States Government.  I admitted that I had aided and abetted in the May 7, 2005, murder of Keith Barnes, at the Federal Penitentiary in Beaumont, Texas.  In the factual basis for the plea, there are statements implicating Joseph Ebron in the murder. I wish to correct those statements.
>
> I was not witness to any conversation about murdering Keith Barnes at which Ebron was present.  I have no knowledge that Ebron helped plan the murder or that he knew it was going to happen.
>
> I never heard Marwin Mosely [sic] or Joseph Ebron say they were going to kill anyone.
>
> During the time Barnes was being murdered, I glanced toward his door, but I did not see anything going on in the room, because there was a towel covering the window.  When Charles Sherman said he could see into Barnes's cell, he must have lied, because a towel covered the window.
>
> I have never said that Ebron stabbed or choked anyone.  I never told prosecutors that Ebron killed anyone.

Marwin Mosely [sic] told me that he had killed Barnes. He did not say that Ebron killed Barnes or helped to kill Barnes.

If Joseph Ebron is given a new trial, I am willing to testify in his defense.

Ebron asserts that this affidavit is newly discovered evidence, requiring the court to grant a new trial. Specifically, he contends that Bacote's affidavit addresses the central issue in this case—"whether Ebron is guilty of capital murder." Ebron argues that Bacote's statements "directly contradict the testimony of the Government's key witness, Charles Sherman."

### a. Evidence Unknown at Time of Trial

Ebron asserts that Bacote's statements were unknown at the time of trial. The government does not contest this argument. Indeed, Bacote's affidavit was unknown to Ebron at the time of trial, as Bacote did not complete the affidavit until October 27, 2009, five months after Ebron's trial and four months after his guilty plea and sentencing. Therefore, Ebron satisfies the first factor.

### b. Due Diligence in Obtaining Evidence

Ebron argues that he exercised due diligence in obtaining a statement from Bacote. The court agrees that Bacote did not offer to provide an affidavit until after Ebron's trial. Furthermore, his counsel's attempt to speak with Bacote prior to trial was unsuccessful.

"Evidence that is unknown at the time of trial cannot be the basis for granting a new trial if the defendant should have known of its existence through the exercise of due diligence." *Wall*, 389 F.3d at 469. "[W]here the new evidence in question is the testimony of a co-defendant who exercised his Fifth Amendment privilege at trial," due diligence may be established by an affidavit of the defendant's counsel, detailing her efforts to solicit a co-defendant's testimony at trial. *United States v. Hernandez-Rodriguez*, 443 F.3d 138, 144 (1st Cir. 2006) (noting that the

defendant does not have the power to compel his co-defendant to waive the privilege against self-incrimination).  In an affidavit, dated November 2, 2009, Ebron's trial counsel, Scardino, explains that Bacote's counsel informed her that "he would exercise his right to refuse to answer any questions about this case."[8]  Hence, in the instant case, the court finds that the second factor is met.

### c.      Whether Evidence is Cumulative or Impeaching

Ebron argues that Bacote's affidavit is not cumulative because "no witness but Ebron himself testified that Ebron was innocent."  Ebron contends that the newly discovered evidence directly contradicts the testimony of Sherman, the government's key witness.  Furthermore, Ebron asserts that the affidavit is not merely impeaching because Bacote's "statements provide the only evidence aside from Ebron's testimony, that Sherman testified falsely."  To the extent that Ebron seeks to use Bacote's affidavit to impeach Sherman's credibility, his argument fails.

"It is well settled that a new trial will not be granted where the newly discovered evidence is merely cumulative or of an impeaching nature."  *United States v. Overton*, 421 F.2d 277, 278 (5th Cir. 1969).  "Impeachment testimony normally is not a basis for granting a motion for new trial."  *Wall*, 389 F.3d at 470 (citing *Mesarosh v. United States*, 352 U.S. 1, 9 (1956); *Villarreal*, 324 F.3d at 326)); *see United States v. Ferrante*, 502 F. Supp. 2d 502, 506 (W.D. Tex. 2006).  Furthermore, "a court must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a co-defendant, since

---

[8] The affidavit attached to Ebron's motion for new trial is dated September 22, 2009.  In this affidavit, however, Scardino inadvertently named Pat Black as the attorney for Bacote.  In Ebron's Motion to Submit Amended Affidavit, filed November 11, 2009, Scardino corrects this error in an amended affidavit.

convicted, had availed himself of his privilege not to testify." *United States v. Jacobs*, 475 F.2d 270, 286 n.33 (2d Cir.), *cert. denied*, 414 U.S. 821 (1973); *accord United States v. Metz*, 652 F.2d 478, 479 n.3 (5th Cir. 1981); *United States v. Miranda*, 951 F. Supp. 368, 370 (E.D.N.Y. 1996). "A convicted, sentenced codefendant has little to lose (and perhaps something to gain) by such testimony." *United States v. Montilla-Rivera*, 115 F.3d 1060, 1066 (1st Cir. 1997) (citing *Freeman*, 77 F.3d at 817 (citing *United States v. Alejandro*, 527 F.2d 423, 428 (5th Cir.), *cert. denied*, 429 U.S. 844 (1976))). "'Such testimony [by sentenced codefendants] would be untrustworthy and should not be encouraged.'" *Id.* (quoting *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir.), *cert. denied*, 506 U.S. 890 (1992)).

As noted above, in his affidavit, Bacote states:

> During the time Barnes was being murdered, I glanced toward his door, but I did not see anything going on in the room, because there was a towel covering the window. When Charles Sherman said he could see into Barnes's cell, he must have lied, because a towel covered the window.

The government contends that Bacote's assertion as to whether he could see what occurred in the cell at the time of the murder is offered merely to impeach the testimony of Sherman. The court agrees. At trial, Sherman testified that there was no towel covering Barnes's cell during his murder:

> Q: Did you tell the jury earlier that there was a towel up over the window?
> A: Yes, ma'am.
> Q: And when was that towel put up on the window?
> A: It was not up during the assault; and when I went to chow, I don't know — I don't know if it was put on right after the assault occurred and they was leaving out. I'm not a hundred percent sure, but it wasn't up on the window during the assault.
>                                  ***
> Q: Well, what I'm saying is, Mr. Sherman, it's a pretty big incident when you either can see inside a window in a cell door as to what is going on, the crime that's being — that transpired in that room or not?

28

| A: | Yes, ma'am. |
|---|---|
| Q: | And it either has a towel over the window or it does not. |
| A: | The window never had a — a towel over the door the entire assault. Not one time during the assault did that towel go over the door. I was able to see in that window until the assault was over with. |

***

| Q: | Well, how long did you look? If you can see in, why didn't you stand up and just look inside the window with the towel over it? |
|---|---|
| A: | There was no towel over the door. |

Moreover, while Ebron proffers Bacote's affidavit to discredit Sherman's testimony, Bacote's version of the events contradicts Ebron's own testimony. At trial, Ebron testified that when he entered Barnes's cell, he did not place a towel over the window of the cell:

| Q: | Okay. So, you did not walk in that cell and put a towel over that door, did you? |
|---|---|
| A: | No, ma'am. No reason to. |
| Q: | You didn't put a towel over the door why? |
| A: | Because there was no reason to. |
| Q: | Why? |
| A: | Because we went in there to talk and walk right back out. Once I find out that this is indeed Keith Barnes, going to walk him up top. |

In fact, Ebron agrees that during Barnes's murder, there was no towel covering the window of the cell:

| Q: | Now, you — you then freely admit that during the time that Keith Barnes was killed, there was nothing blocking the window into that cell; isn't that true? |
|---|---|
| A: | That's correct. |
| Q: | And that is exactly what Charles Sherman said; isn't that true? |
| A: | That's correct. |

Hence, Bacote's affidavit appears to impeach Sherman, specifically by alleging that there was a towel over Barnes's cell window during the incident. At trial, however, both Ebron and Sherman agree that there was no towel covering the window during the murder. Thus, the nature of Bacote's affidavit is impeaching of prior testimony offered at trial by both Sherman and Ebron

29

and merely affects the credibility of the prior evidence, including Ebron's own account of the events.

### d.  Materiality of Evidence

Ebron asserts that Bacote's affidavit is material because it addresses whether he is guilty of capital murder in three respects.  First, Bacote "says that he was not part of any conversation about murdering Keith Barnes at which Ebron was present."  Second, Bacote "states that he could not see into Barnes's room during the murder."  Finally, although Bacote states that Mosley told him that he had killed Barnes, "Mosley said nothing about Ebron participating."

Newly discovered evidence "must be material to the issues involved and to be of such a nature that upon a new trial a different result would likely be reached." *Overton*, 421 F.2d at 278 (citing *Berry*, 10 Ga. at 527; *United States v. Costello*, 255 F.2d 876, 879 (2d Cir. 1958)).  "'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.'" *United States v. Kates*, 174 F.3d 580, 583 (5th Cir. 1999) (quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1978)).  Moreover, "'recanting affidavits and witnesses are viewed with extreme suspicion by the courts.'" *United States v. Abdallah*, 629 F. Supp. 2d 699, 736 (S.D. Tex. 2009) (quoting *Spence v. Johnson,* 80 F.3d 989, 1003 (5th Cir. 1996)); *see also United States v. Adi*, 759 F.2d 404, 408 (5th Cir. 1985) (citing *United States v. Kearney*, 682 F.2d 214, 219 (D.C. Cir. 1982); *United States v. Vincent*, 491 F.2d 1326, 1332 (2d Cir.), *cert. denied*, 419 U.S. 880 (1974); *Newman v. United States*, 238 F.2d 861, 862 n.1 (5th Cir. 1956)).  "It goes without saying that not every such recanting affidavit requires a new trial of the other defendant for whose benefit it is produced." *Ledet v. United States*, 297 F.2d 737, 739 (5th Cir. 1962).

Bacote's affidavit does not purport to exonerate Ebron. Instead, Bacote denies any personal knowledge of Ebron's involvement in the murder of Barnes. The government is correct that, if permitted to testify at a new trial, Bacote's testimony would not be material, as he would merely claim that he was unaware of Ebron's playing any role in the murder. Bacote does not dispute, however, that Ebron was in Barnes's cell at the time of the murder. Furthermore, because Bacote alleges that there was a towel over the window of Barnes's cell during the incident, he would not be able to testify as to what transpired in the cell. Whether Ebron was present during any conversation Bacote witnessed about the murder of Barnes and whether Mosley confided in Bacote that Ebron participated in the murder is immaterial.

Moreover, the court finds Bacote's credibility to be lacking. Bacote, who is mentally retarded, has provided numerous accounts of the incident. Specifically, in the factual basis supporting his plea, Bacote states:

> During the hours following the discovery of Barnes' body, prison officials began investigating the circumstances of Barnes' death. This process included reviewing surveillance camera tape from the DB unit. During this review, BOP Officer Robery Nylen was able to identify BACOTE, an inmate housed in the DB Unit, going into Barnes' cell on at least one occasion on the afternoon of the murder. Upon further review of several different camera angles, Nylen observed BACOTE within DB Unit. Nylen observed BACOTE enter Barnes' cell at approximately 5:20 p.m. (real time) where Barnes was alone at the time. Almost immediately, Marwin Mosley and Joseph Ebron followed BACOTE. Both Marwin Mosley and Joseph Ebron were wearing objects on their head to conceal their identities. Approximately thirty (30) seconds later BACOTE is seen leaving Barnes' cell and positioning himself back at the steps adjacent to the door to cell 305. For approximately the next nine (9) minutes BACOTE stayed at the steps acting as a "lookout" while Mosley and Ebron killed Barnes. When Mosley and Ebron exited Barnes' cell after the murder, BACOTE is observed going up the steps and into the laundry room with Mosley. BACOTE knew previously that the purpose of Marwin Mosley and Joseph Ebron's entry into Barnes' cell was to murder Barnes. BACOTE's actions as a look-out knowingly facilitated the commission of the offense of murder, and he readily admits that his actions were intended to help carry out the murder of Keith Barnes.

(emphasis added).

Furthermore, during his plea hearing, the following colloquy occurred in which Bacote admits that Mosley and Ebron murdered Barnes:

| | |
|---|---|
| THE COURT: | All right. Do you acknowledge and agree with the government's summary of the facts constituting proof of the commission of the offense and the charges against you in the information in every respect? |
| THE DEFENDANT: | Yes, ma'am. |
| THE COURT: | Have you signed the document embodying the Factual Basis for your plea? |
| THE DEFENDANT: | Yes, ma'am. |
| THE COURT: | Do you understand and agree with it? |
| THE DEFENDANT: | Yes, ma'am. |
| THE COURT: | Are there any changes you would offer? |
| THE DEFENDANT: | No, ma'am. |
| THE COURT: | Tell me in your own words what you did wrong. |
| THE DEFENDANT: | When I went in the cell and when I came out the cell, that I knew that — that he was about to die. |
| THE COURT: | Well, who are you talking about? |
| THE DEFENDANT: | Barnes. |
| | *** |
| THE COURT: | . . . I'd like to hear Mr. Bacote tell me what he did wrong. |
| THE DEFENDANT: | I acted as a lookout. |
| THE COURT: | A lookout for what? |
| THE DEFENDANT: | For a murder. |
| THE COURT: | Of whom? |
| THE DEFENDANT: | Huh? |
| THE COURT: | Of whom? |
| THE DEFENDANT: | Of Keith Barnes. |
| THE COURT: | By whom? |
| THE DEFENDANT: | Marwin Mosley. |
| THE COURT: | And what about Ebron? You just said that you knew — |
| THE DEFENDANT: | And Ebron. |
| THE COURT: | Okay. All right. And do you — and by serving as lookout, how did you assist in this murder? |
| THE DEFENDANT: | If anybody was to come, I was suppose to told them. |
| THE COURT: | Okay. And they would have called off the murder? |
| THE DEFENDANT: | Yeah. I supposed to call his name. You know what I'm saying? I supposed to call Funk name. |

| THE COURT: | You were supposed to call Funk's name? |
| THE DEFENDANT: | Yeah. |
| THE COURT: | And then it would have not happened? |
| THE DEFENDANT: | And then it would — right. |

(emphasis added).

Due to its contradictory nature, Bacote's affidavit is of marginal value to Ebron's defense. While the affidavit attempts to minimize Ebron's culpability, it impeaches both Ebron's and Sherman's trial testimony as well as his own allocution to the court. Accordingly, the court concludes that Bacote's affidavit is immaterial.

### e. Whether Evidence Would Probably Produce an Acquittal

Based on the foregoing analysis, it is unlikely that a new trial would probably produce an acquittal. While Bacote's affidavit serves to impeach Sherman's testimony, it also simultaneously contradicts Ebron's testimony. Additionally, the statements contained in the factual basis signed by Bacote and the colloquy during his plea hearing undermine his credibility as a witness. Accordingly, because Ebron does not meet his burden as to three of the five *Berry* factors, his request for a new trial based on newly discovered evidence is denied.

### E. Evidentiary Hearing

With regard to Ebron's request for an evidentiary hearing, "the decision to hold a hearing rests within the sound discretion of the trial court." *United States v. Blackburn*, 9 F.3d 353, 358 (5th Cir. 1993), *cert. denied*, 513 U.S. 830 (1994)). Furthermore, "[a] motion for a new trial can ordinarily be ruled upon without conducting an evidentiary hearing." *United States v. Simmons*, 714 F.2d 29, 30 (5th Cir. 1983). "[T]he acumen gained by the trial judge in presiding over the course of the trial makes Rule 33 motions directed to the same judge 'particularly suitable for ruling without a hearing.'" *United States v. MMR Corp.*, 954 F.2d 1040, 1046 (5th Cir. 1992)

(quoting *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977) (noting that the unique situations in which evidentiary hearings have been ordered typically involve allegations of jury tampering, prosecutorial misconduct, or third-party confession)).  In light of this court's first-hand familiarity with the guilt-innocence phase and the fact that Ebron's purported grounds for a new trial do not involve allegations of jury tampering, prosecutorial misconduct, or third-party confessions, his request for an evidentiary hearing is denied.

III.    Conclusion

Based on the foregoing analysis, the court finds that Ebron has failed to establish that Johnson's dismissal as a juror was improper.  Moreover, Ebron has not satisfied the *Berry* analysis necessary to justify a new trial based on newly discovered evidence.  Because Ebron has not demonstrated that a miscarriage of justice occurred at trial, the instant action does not qualify as an exceptional case, and the interest of justice does not demand that a new trial be conducted. Accordingly, Ebron's motion for new trial is DENIED.

SIGNED at Beaumont, Texas, this 28th day of January, 2010.

_Marcia A. Crone_
_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE